AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Records and information associated with the cellular telephone assigned call number 414-892-3971 (Target Cell Phone) whose service provider is T-Mobile/Metro PCS.

Case No. 19-935 M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, § 846, 841(a)(1) and 843(b).

The application is based on these facts: See attached affidavit.

☒ Delayed notice of __30__ days (give exact ending date if more than 30 days: November 15, 2019) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____ SA 10-15-19
Applicant's signature

Special Agent Jeff Milam, DEA
Printed Name and Title

Sworn to before me and signed in my presence:
Date: October 15, 2019

_____
Judge's signature

City and State: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
Printed Name and Title

<sub>Case 2:19-mj-00935-NJ   Filed 12/06/19   Page 1 of 20   Document 1</sub>

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jeff Milam, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (**414) 892-3971**, ("**Target Cell Phone**"). The **TCP** service provider is T-Mobile/Metro PCS, which is a wireless telephone service provider headquartered in Parsippany, New Jersey. The **TCP** is subscribed to "LLOYD JACKSON" Milwaukee, Wisconsin 53206. The **TCP** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration, and have been since September 2014. Prior to my current assignment, I was employed as a police officer with the St. Louis County Police Department in St. Louis, Missouri. During the last three years of my previous employment, I was a Task Force Officer with the DEA. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my

training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics case agents, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

4. Based upon my training and experience, as well as information relayed to me during the course of my official duties, I know that a significant percentage of narcotics, specifically marijuana, cocaine, heroin and methamphetamine, imported into the United States comes from Mexico and enters the domestic market at various points along the southwest border of the United States. Based on training and experience, I also know that a significant amount of cocaine, marijuana, heroin and methamphetamine enters the United States through Mexico, which controls the transportation and sale of cocaine, marijuana, heroin, and methamphetamine into the United States.

5. Additionally, I know that illegal narcotic sales in the United States generate billions of dollars annually, most of it in United States currency. Efforts to legitimize or "launder" this

2

Case 2:19-mj-00935-NJ   Filed 12/06/19   Page 3 of 20   Document 1

cash by the drug distributors are subject to detection because of intense scrutiny placed on large financial transactions by U.S. banks. To avoid detection, the cartels developed a number of money laundering systems to avoid financial transaction reporting requirements.

6. In addition, I have also learned narcotic traffickers routinely utilize narcotics proceeds to purchase assets, to include: real property and/or invest in legitimate business ventures. By doing so, narcotics proceeds are introduced into the financial system. The narcotics traffickers then utilize these assets to facilitate legitimate businesses designed to effectively launder drug proceeds. Once the assets are no longer needed, they are sold, potentially for a profit. Based on my training, experience, and conversations with other law enforcement officers, traffickers are also known to take narcotics proceeds and smuggle them back to the source of supply for the drugs through bulk currency transfers via vehicles or money orders.

7. Based on my experience in conducting criminal investigations of violations of the Controlled Substances Act, I know that "Drug Trafficking Organizations" (DTOs) have developed a number of methods to insulate their illegal activities from detection by law enforcement. These methods are common to major DTOs to varying degrees of sophistication.

8. Based on my training, experience, and conversations with other law enforcement officers, I know that distributors of marijuana, methamphetamine, cocaine, heroin, as well as other controlled substances, often utilize cellular and "hardline" telephones. Additionally, I know that drug dealers often change their phone numbers and cellular devices on a frequent basis in an attempt to thwart law enforcement from tracking their phones as well as a means to conceal their identities. Based on my training, experience, and conversations with other law enforcement officers, I know that these individuals often use code words to discuss controlled substances and methods of concealing controlled substances while talking on the telephone. Based on training,

3

experience, and conversations with other law enforcement officers, I know that violators of the controlled substances law often conduct extensive counter-surveillance to avoid law enforcement detection.

9. Based upon training and experience, I know that narcotics-trafficking and money-laundering organizations routinely utilize several operational techniques to sustain their illegal enterprises. These practices are designed and implemented to achieve two paramount goals: (1) the successful facilitation of the organization's illegal activities, including the importation and distribution of controlled substances and the subsequent repatriation of the proceeds of that illegal activity; and (2) the minimization of the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement. More specifically, based on my training and experience, I assert the following:

    a. The more entrenched and sophisticated drug-trafficking organizations routinely compartmentalize their illegal operations. The compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation effectively minimizes the potential damage an individual cooperating with law enforcement could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization.

    b. Members of these organizations routinely utilize communications facilities, i.e. cellular telephones, to communicate directions and information about the organization's illegal activities to other organization members.

    c. During the course of these telephonic communications, organization members routinely use coded references and encryption in an effort to elude law enforcement detection.

    d. The communication of time sensitive information is critical to the successful conduct of these organizations' illegal activities. The critical nature of this information stems from the necessity of the organization's management to provide direction for the importation and distribution of narcotics, as well as, the subsequent laundering of the proceeds of those illegal activities.

4

e. Narcotics traffickers, and money launderers associated with them, often confine their illegal telephonic communications to long-trusted organizational members and other high-level narcotics traffickers in an attempt to evade law enforcement and circumvent narcotics investigations; and

f. Narcotics traffickers routinely utilize fictitious names, or other individuals, in which to register pagers, telephones, vehicles, real property, and utility services in order to avoid detection by law enforcement.

10. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 846, 841(a)(1), and 843(b) (conspiracy to distribute controlled substances (cocaine and heroin) and use of a communication facility to facilitate a drug-trafficking crime) are being committed, and will be committed by Rayvon EDWARDS (Black Male, DOB: 07-21-1993), Elwonderick ROBINSON (Black Male, DOB:02-26-1994), Javier BERRIOS (Hispanic Male, DOB: 03-02-1976), Chad ESSER (White Male, DOB: 04-14-1981) and other associates of their drug trafficking organization ("BERRIOS DTO") who have yet to be identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

**PROBABLE CAUSE**

12. In February 2018, Wisconsin Department of Justice - Division of Criminal Investigation (DCI) and members of the United States Drug Enforcement Administration - Milwaukee (DEA) initiated a narcotics investigation regarding multiple individuals working together to distribute large quantities of heroin and cocaine throughout Milwaukee, Wisconsin. Two of those individuals were later identified as Javier BERRIOS, Paul LAVOE, and Chad ESSER.

13. Case agents received information from a confidential source (hereinafter "CS #1") regarding the illegal drug trafficking activities of BERRIOS and LAVOE. CS #1 has been providing reliable information to DCI since February, 2018. Specifically, CS #1 conducted multiple controlled purchases of cocaine and heroin from BERRIOS and LAVOE.

14. Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

15. CS #1 has provided information about the membership, structure, and customs of the BERRIOS DTO. CS #1 has positively identified BERRIOS and LAVOE, members of the

6

BERRIOS DTO, through Wisconsin Department of Transportation photographs. CS #1 has conducted several, consensually-recorded conversations with BERRIOS and LAVOE, including audio and video recordings with LAVOE and BERRIOS, both in person and on the telephone during the course of this investigation. CS #1 has conducted controlled purchases of heroin and cocaine from BERRIOS and LAVOE. CS #1's information concerning the BERRIOS DTO has been corroborated by other confidential sources, specifically SOI#1 *(see paragraph 23)*, information obtained from various public databases, physical surveillance, and through controlled drug purchases, money deliveries and consensually-recorded conversations and phone calls that CS #1 had with BERRIOS and LAVOE. CS #1's information has never been found to be false or misleading.

16. CS #1 has a criminal history that includes arrests for Possession of a Firearm by a Felon, Possession with the Intent to Deliver Cocaine and Heroin, Possession of Marijuana and Cocaine, Bail Jumping, Theft, and Criminal Damage to Property. CS #1 is receiving consideration in connection with a pending drug case from the Milwaukee County District Attorney's Office for his/her cooperation with law enforcement.

17. CS #1 was interviewed by investigators in February, 2018 and provided detailed information about the current and past drug-trafficking activities of Paul LAVOE and Javier BERRIOS. CS #1 has been purchasing up to four and a half (4.5) ounces of cocaine, twice a week, from BERRIOS and LAVOE for the past year and a half. CS #1 explained he/she always has to call LAVOE, and LAVOE will then call BERRIOS at telephone (414) 301-0926 (hereafter Predecessor Phone 1 (PP1)). LAVOE contacts BERRIOS in order to arrange a meeting between CS #1 and BERRIOS at LAVOE's business, "PL Power Cycles," located at 1531 South 1st Street, Milwaukee, Wisconsin. BERRIOS will then meet CS #1 at LAVOE's business and sell cocaine

7

and/or heroin to CS #1. CS #1 has made four controlled buys of cocaine and heroin from Paul LAVOE and Javier BERRIOS, between February 14, 2018 and to March 27, 2018.

18. CS#1 stated BERRIOS also distributes large quantities of heroin to Desmond LOVE (aka "YPN Rex."). According to CS#1, LOVE is part of a Milwaukee-based rap music group, with members utilizing the "YPN" moniker on their names. CS#1 stated the "YPN" stands for "Young Paid Niggas" and "YPN" is believed to be a street gang operating in north Milwaukee, Wisconsin. In addition to making/producing rap music, "YPN" is believed to be involved in violent crimes, which include robbery, assault, and firearms-related crimes. Through an open-source query of social media, investigators identified numerous Facebook profile accounts with "YPN" linked (Friends) to the "YPN Rex" profile. These accounts depict photographs, and videos of male subjects posing with assault-style rifles and handguns with extended magazines.

19. The information CS #1 provided has been corroborated by case agents through controlled purchases of cocaine and heroin (as described below). For the reasons stated in paragraphs 14 through 20, I consider CS #1 to be reliable.

20. On July 2nd, 2018, investigators conducted surveillance of "J Garage." During their surveillance, investigators observed BERRIOS at the business. Minutes later, investigators observed a black male subject arrive at "J Garage" and carry a large white bag into the business. Approximately five minutes later, the same male subject exited the business carrying the same white bag and departed the area. Investigators later identified the male subject as Desmond LOVE, an alleged member of the "YPN" ("Young Paid Niggas") street gang. Based on their training and experience, and the investigation to date, investigators believe LOVE had just conducted a drug/money transaction with BERRIOS.

21. On November 16, 2018, investigators conducted surveillance of "J Garage" and

8

observed a gold, 2-door BMW arrive at BERRIOS' shop. Investigators observed a black male subject, later identified as Rayvon EDWARDS, enter the business. EDWARDS stayed for a short duration, before departing the area. Additionally, investigators later learned that EDWARDS is currently on a GPS ankle monitoring device for a previous State of Wisconsin drug arrest. Investigators have obtained historical GPS location information on EDWARDS' device, which showed it to make several stops at BERRIOS' over the last several months.

22. Over the next several months, investigators continued to exploit all available investigative leads into BERRIOS, including the identification of another predecessor phone (PP2): (414) 915-4664. During this time, investigators learned that LAVOE was out of the country. In Spring 2019, LAVOE returned to the Milwaukee, Wisconsin area. Investigators attempted to reconnect CS #1 to BERRIOS through LAVOE, however, LAVOE was unwilling to contact BERRIOS for the drug/money transaction.

23. In late August 2019, investigators debriefed a Source of Information (SOI #1) who provided information on members of the BERRIOS DTO. SOI #1 stated he/she knew BERRIOS through an associate, identified as Manuel PEREZ JR. SOI #1 stated BERRIOS owned a vehicle repair shop on West Stevenson Street near 76th Street in Milwaukee, Wisconsin. SOI#1 stated BERRIOS utilizes the shop to distribute heroin and cocaine. SOI #1 stated PEREZ JR. works at BERRIOS' shop. SOI #1 further stated that in June 2019, SOI #1 began visiting BERRIOS' shop ("J Garage," 7520 W. Stevenson Street, Milwaukee, Wisconsin.) at the direction of PEREZ JR. While there, PEREZ JR. introduced SOI#1 to BERRIOS and PEREZ SR. Approximately one week later, PEREZ JR. brought SOI#1 to PEREZ JR.'s residence, located on South 71st Street near West Orchard, West Allis, Wisconsin. While inside the residence, PEREZ JR. showed SOI#1 approximately six (6) kilograms of cocaine, and six (6) kilograms of heroin. PEREZ JR. and

9

SOI#1 discussed their ability to distribute that amount of narcotics. They agreed that it would be difficult to distribute the quantity of heroin and cocaine in a reasonable time frame. SOI#1 stated he/she and PEREZ JR. then loaded the narcotics in SOI #1's vehicle and drove to BERRIOS's shop. BERRIOS reluctantly received the narcotics and placed them inside his (BERRIOS) black Mercedes SUV.

24. SOI #1 stated that he/she and PEREZ JR. obtained a second kilogram of cocaine while at BERRIOS' shop, which they divided in half. SOI #1 stated while waiting for the cocaine, SOI #1 observed BERRIOS direct an employee, known to SOI #1 as "Chad," to go elsewhere to retrieve the cocaine. SOI #1 stated that "Chad" departed in an older-model Chevrolet Blazer and then returned to the shop after a short while. SOI #1 stated "Chad" brought SOI#1 to "Chad's" vehicle, where "Chad" removed the kilogram of cocaine from inside, before handing the cocaine to SOI#1. SOI#1 described "Chad" as a white male, mid-30's, short stature. Investigators later showed SOI#1 a surveillance photograph of ESSER (without identifiers), which SOI#1 positively identified as "Chad". Investigators believe "Chad" is Chad ESSER, as supported by multiple surveillances of the shop, where ESSER is present, and observed operating an older-model blue/black Chevrolet Blazer, with a white hood. SOI#1 stated he/she believed BERRIOS and PEREZ SR. purposely avoid telephonic contact with their distributors, instead relying on PEREZ JR. and ESSER to contact and meet with these individuals to further compartmentalize their DTO.

25. SOI#1's criminal history includes traffic offenses (Operating after Revocation, Reckless Driving and Operating while Intoxicated). SOI #1 is receiving consideration in connection with a pending drug case from the Waukesha County District Attorney's office for his/her cooperation with law enforcement.

26. On August 16, 2019, investigators conducted surveillance of EDWARDS, whose GPS ankling monitoring device was showing to be in the area of North 60th Street and West Chambers Street in Milwaukee, Wisconsin. Investigators observed EDWARDS previously identified gold BMW parked in front of 2979 North 60th Street. At this time, investigators observed EDWARDS entering/exiting a residence, later determined to be 2973 North 60th Street, Milwaukee, Wisconsin. Investigators later observed EDWARDS exit the residence, talking on a cellular telephone. At this same time, investigators observed a blue van pull onto West Chambers Street, just west of North 60th Street. EDWARDS walked to the blue van and leaned into the open driverside window. Moments later, EDWARDS returned to 2973 North 60th Street and the blue van departed the area. Based on their training and experience, and the investigation to date, investigators believe EDWARDS conducted a drug/money transaction with the occupant(s) of the blue van.

27. In August 2019, investigators received information from a Milwaukee Police Department Confidential Source (CS#2). CS#2 stated recently, he/she was driving around Milwaukee, Wisconsin with a male subject identified as Khalil WAYLD, who CS#2 believes utilizes EDWARDS as a heroin/cocaine source of supply. CS#2 stated at one point, WAYLD exited the vehicle CS#2 was riding in, and left his (WAYLD's) cellular telephone in the vehicle. CS#2 took a screenshot photograph of the last number WAYLD was in contact with. The photograph showed a received call from "Von Number Num.." and listed the number of 414-892-3971 (**TCP**) at a time of 7:24 pm. CS#2 further provided WAYLD's cellular telephone number (414) 659-7589. CS#2 has positively identified EDWARDS from a photograph (without identifiers).

11

28. Investigators obtained telephone toll data on the **TCP**, which showed a high frequency of contact with WAYLD (138 contacts from 07-21-2019 to 08-15-2019). Additionally, the **TCP** was in frequent contact with cellular telephone (414) 766-3834, which is utilized by ESSER (97 contacts between 07-20-2019 to 08-16-2019).

29. CS#2 has a criminal history that includes convictions for Robbery Threat of Force, and Felon in Possession of a Firearm. CS #2 is receiving consideration in connection with a pending drug case from the Milwaukee County District Attorney's Office for his/her cooperation with law enforcement.

30. On September 23, 2019, the Honorable William E. Duffin, U.S. Magistrate Judge, Eastern District of Wisconsin, authorized an order for a Pen Trap and Trace (App. No. 13210), and search warrant (Case No. 19MJ-1317) for GPS Precision Location Information (PLI) on telephone (414) 766-3834, which is utilized by ESSER.

31. On September 27, 2019, investigators conducted surveillance of "J Garage," which is located at 7520 West Stevenson Street, Milwaukee, Wisconsin. During this time, investigators monitored the court-authorized Pen Trap and Trace, and GPS PLI on ESSER's telephone, who was currently at the business. At approximately 10:14 a.m., ESSER received an in-coming call from the **TCP**. Investigators remained in the immediate area of "J Garage," and at approximately 11:18 a.m., investigators observed a black, 2-door Audi coupe pull into the business lot. Investigators observed a black male subject (strongly resembling EDWARDS), walk over to ESSER, who was sitting inside a red flatbed tow truck. The two parties appeared to briefly meet near the open driver door of the tow truck, before the black male subject re-entered the black Audi and departed the area. Investigators attempted to follow the vehicle as it began traveling at a high rate of speed, and surveillance was terminated.

32. On September 30, 2019, investigators conducted surveillance of 2973 North 60th Street, Milwaukee, Wisconsin. At approximately 1:40 p.m., investigators established surveillance in the immediate area, and observed a black, 2-door Audi coupe (similar vehicle observed at "J Garage" on September 27, 2019) parked in the driveway of the above residence. Over the next approximate two hours, investigators observed a black male subject, positively identified as EDWARDS, repeatedly walk from the rear of the residence to the black Audi. EDWARDS opened the driver and passenger doors numerous times, and also opened/closed the trunk numerous times. Addtionally, investigators observed EDWARDS utilizing two cellular telephones while he walked around the front yard of the residence.

33. Investigators also observed a silver, 4-door Audi sedan, parked directly behind the black Audi. Investigators observed EDWARDS occasionally speak with the occupant of the silver Audi, as it remained in the driveway of 2973 North 60th Street for the duration of the surveillance. The silver Audi eventually departed the area, and investigators coordinated with the Milwaukee Police Department to conduct an ID traffic stop of the silver Audi, bearing Wisconsin temporary license H52-617. The driver (sole occupant) was identified as Elwonderick ROBINSON, B/M, DOB: 02-26-1994.

34. Investigators conducted toll analysis on the **TCP** and identified cellular telephone (262) 883-5043 through law enforcement databases as belonging to ROBINSON. The **TCP** and ROBINSON are in frequent contact (48 contacts from 08-09-2019 to 08-17-2019).

35. On October 3, 2019, investigators utilized a Milwaukee Metropolitan Enforcement Group (MMEG) confidential source (CS#3) to make a controlled purchase of approximately 0.5 grams of suspect heroin from a male subject known to CS#3 as "Keefe." Prior to the drug/money transaction, CS#3 was searched for illegal contraband, which met with negative results. CS#3 was

13

provided $40.00 in pre-recorded buy funds, and driven to the meet location by an undercover agent (U/C). The transaction occurred in the area of West Chambers and North 59th Street. During the drug/money transaction, CS#3 entered a silver, 4-door Audi, bearing the same Wisconsin tempory license as referenced in paragraph 33.

36. Following the drug/money transaction, investigators debriefed CS#3. Investigators showed CS#3 a photograph of ROBINSON (without identifiers), which CS#3 positively identified as "Keefe." CS#3 further stated he/she has purchased heroin and cocaine from "Keefe" (hereafter referred to as ROBINSON) for several years. CS#3 stated recently, during several of the drug/money transactions, ROBINSON was occupying a black Audi and accompanied by another black male subject. Investigators showed CS#3 a photograph of EDWARDS (without identifiers), which CS#3 positively identified as the male subject who accompanied ROBINSON during several drug/money transactions with CS#3.

37. Investigators conducted telephone toll analysis of the **TCP** and did not observe any contact with the **TCP** and the cellular telephone number utilized by ROBINSON to distribute narcotics to CS#3. Based on investigators' training and experience, and the investigation to date, investigators believe ROBINSON utilizes a secondary cellular telephone (262) 883-5043, to distribute narcotics, and contacts EDWARDS on the **TCP** (to obtain narcotics from EDWARDS).

38. CS#3 has a criminal history that includes traffic-related offenses. CS #3 is receiving consideration in connection with a pending drug case from the Milwaukee County District Attorney's Office for his/her cooperation with law enforcement.

39. Based on their training and experience, and the investigation to date, investigators believe EDWARDS is using the **TCP** to distribute narcotics in the Milwaukee, Wisconsin metropolitan region. This belief is supported by contact between the **TCP** and ESSER, supported

14

by physical surveillance of EDWARDS arriving/departing J Garage, and telephonic contact with ROBINSON (co-conspirator and heroin distributor).

40. The affiant is trained and experienced in the administration of the Nark II, 07 Field Test, which tests for the presence of cocaine and cocaine base. The affiant is also trained and experienced in the administration of the Nark II, 11 Field Test, which tests for the presence of heroin. The affiant has used both field tests in the past and found them to be reliable.

41. Case agents with DCI, DEA and Department of Homeland Security – Homeland Security Investigations (HSI) are investigating Rayvon EDWARDS, Chad ESSER, Javier BERRIOS, and other associates for conspiracy to distribute cocaine and heroin. The investigation to date has included traditional law enforcement methods, including, but not limited to: controlled buys, interviews with confidential sources and sources of information, information from other law enforcement officers, documentary evidence, pen register, trap and trace, and telephone toll data, recorded telephone calls with targets, and physical surveillance.

42. In my training and experience, I have learned that T-Mobile/Metro PCS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in

15

some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

43. Based on my training and experience, I know that T-Mobile/Metro PCS can collect E-911 Phase II data about the location of the **TCP** including by initiating a signal to determine the location of the **TCP,** on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available.

44. Based on my training and experience, I know that T-Mobile/Metro PCS can collect cell-site data about the Target Cell Phones

## AUTHORIZATION REQUEST

45. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

46. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure

16

of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

47. I further request that the Court direct T-Mobile/Metro PCS to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile/Metro PCS for a time period of 45 days from the date the warrant is signed. I also request that the Court direct T-Mobile/Metro PCS to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's services, including by initiating a signal to determine the location of the **Target Cell Phone** on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

48. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

17

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **(414) 892-3971**, (the "**Target Cell Phone**" whose service provider is T-Mobile/Metro PCS, a wireless telephone service provider headquartered in Parsippany, New Jersey.

2. Information about the location of the **Target Cell Phone** that is within the possession, custody, or control of T-Mobile/Metro PCS if needed: including information about the location of the **Target Cell Phone** if the telephone and/or telephones is and/or are subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the **Target Cell Phone** described in Attachment A for a period of forty-five days from the date the warrant is signed, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile/Metro PCS, T-Mobile/Metro PCS is required to disclose the Location Information to the government. In addition, T-Mobile/Metro PCS must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile/Metro PCS's services, including by initiating a signal to determine the location of the **Target Cell Phone** on T-Mobile/Metro PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).